UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES

v.                                                      C.R. No. 09-160-ML

JASON COLLYMORE

## MEMORANDUM AND ORDER

This matter is before the Court on Jason Collymore's ("Defendant") Motion to Suppress Physical and Testimonial Evidence and the Government's opposition thereto. The Defendant moves this Court to suppress the physical evidence seized pursuant to a search warrant and all testimonial evidence obtained as a result of Defendant's arrest. For the reasons set forth below, Defendant's Motion to Suppress is denied.

### I.   FINDINGS OF FACT AND CREDIBILITY DETERMINATIONS

The Court conducted a two day evidentiary hearing on June 16, 2010 and June 21, 2010. At the suppression hearing, the Government presented two witnesses; the Defendant presented six witnesses; and the Government then presented one rebuttal witness.[1] The following findings of fact are based upon the Court's evaluation of the evidence, its determination of the credibility of the witnesses' testimony, and its review of the parties' memoranda.

### A.   The Government's Case

The Government presented two witnesses: (1) Eric Greene ("Greene") and (2) Curt Desautels ("Desautels"). In light of the testimony summarized below, the Court finds the

---

[1] The rebuttal witness's testimony added nothing of substance that would affect the Court's factual findings or legal conclusions.

testimony of both Greene and Desautel to be credible.

### i. The Arrest

At approximately 1:50 in the morning on November 3, 2009, Greene, a Providence police officer, was dispatched to 54 Dartmouth Avenue[2] for a report of a disturbance involving a weapon. Gov. Exhibit 1. When Greene arrived at that address, he briefly detained a potential suspect. While patting down the suspect, Greene heard Brian Clements ("Clements") pointing to 53 Dartmouth Avenue, yelling – "That's not him. That's not him. He just put a f\*\*\*ing gun to my chin. He was up there on the second floor." Transcript vol. I, 9:13-14, June 16, 2010.[3] Greene testified that Clements, who was visibly "upset," was "bleeding from his chin and his neck area" and had abrasions that were not present when Greene had dropped him off earlier that evening. Id. at 12:9-10.

According to Greene, he then observed a "silhouette of a person in the door of the entrance to 53 Dartmouth Avenue." Id. at 12:23-24. When Greene approached the door, he pulled on it a few times, noticed it was locked, and then banged on it until it was opened from the inside by Defendant. Greene kicked debris into the door to keep it open, and heard Clements repeatedly yelling from the courtyard – "That's him. That's the mother f\*\*\*er right there." Id. at 13:20. Defendant began to run up the stairs and Greene pursued him. Greene noticed that Defendant's right hand was in front of his body near his waist, leading Greene to believe that Defendant was armed. Id. at 14:6-7.

---

[2] 53 and 55 Dartmouth Avenue are adjoining three-story apartment buildings that share a common courtyard. Gov. Exhibit 2.

[3] Greene testified that he recognized Clements because he had transported him from the Providence Police Department to 55 Dartmouth Avenue earlier that evening, after Clements had given a witness statement about an unrelated assault that he had witnessed at the same address.

Greene testified that he tackled Defendant as he reached the second floor landing in the doorway of apartment 3, where the door was wide open. After a short struggle, Greene handcuffed Defendant and patted him down. While Greene did not find a weapon on Defendant's person, he did observe, through the open doorway of apartment 3, a firearm on the table next to the couch and a bag of marijuana on the coffee table. According to Greene, the gun was "approximately five feet" away from him and in plain view. Transcript vol. I, 15:18.

### ii. Initial Search of Defendant's Apartment

Approximately five minutes after arriving at the scene, Greene radioed dispatch from his portable radio and requested that his supervisor, Curt Desautels, a sergeant with the Providence Police Department, respond to the scene. Greene also requested that detectives from the Bureau of Criminal Identification be notified, because of the presence of a firearm at the scene.

Within minutes, Robert Papa, an officer with the Providence Police Department, arrived at the scene. Id. 15:24. Greene testified that he told Papa to escort Defendant out of the building so that Greene could remain with the handgun until Desautels arrived. Id. at 17:8. Papa testified that he took Defendant downstairs and placed him in a patrol car. Id. at 142:18-21

When Desautels arrived, he was approached by Clements, who told him "a guy had put a gun to [his] chin." Id. at 66:1. Desautels testified that he spoke briefly with Papa and then proceeded to the second floor of 53 Dartmouth Avenue, where he found Greene. Desautels testified that Greene told him that he had observed a gun and a bag of marijuana on a table inside apartment three. Desautels then went into the apartment and used a flashlight to conduct a "protective sweep" of the apartment. He looked in a closet, underneath the bed, and in a large black temporary closet, because he thought someone could be hiding inside. Id. at 68:1-9. Inside

the temporary closet, he located a marijuana growing system. Desautels then proceeded to search the bathroom and the kitchen. Once Desautels made the determination that the apartment was safe and that no one could gain access to the firearm, he posted an officer at each door and went outside. He did not seize any items, and instead waited until a search warrant was obtained.

Once outside, Desautels spoke with Clements again. Desautels took Defendant out of the police vehicle and uncuffed him. Desautels testified that Clements immediately said "Sarge, that's him. He changed his clothes up." Transcript vol. I, 69:23-24.[4] At 2:18 a.m., Papa informed dispatch that he was transporting Defendant to central station. Def. Ex. G. at 5.

### iii.   Execution of the Search Warrant

On November 3, 2009, at approximately 9:45 AM, Detective Juan Robles, along with members of the Narcotics and Organized Crime Bureau, executed a search warrant for 53 Dartmouth Avenue, apartment number 3.[5] During the search, the officers recovered –

> (1) a loaded gun from the table near the front door, (2) a second loaded handgun from a shoe box in the bedroom, (3) a third gun with five rounds of ammunition in the hallway closet, (4) a clear plastic bag of marijuana on the table near the doorway, (5) a jar of marijuana, fifty-four oxycodone pills, and $1,298 in small bills in a shoe box in the doorway of the bedroom, (6) four large and five small marijuana plants, a grow light, thermometer, all in the black portable closet in the bedroom, (7) a bag of 15.3 grams of cocaine in a cabinet in the kitchen, (8) a credit card in Defendant's name on the television stand in the living room, (9) a Massachusetts drivers license in Defendant's name in the hallway, (10) a rental receipt and credit card in the bedroom dresser, and (11) a bottle of inositol powder, a box of baking soda and a digital scale from the kitchen.

### iv.   Defendant's Interview

At approximately 1:20 p.m. on November 3, 2009, several members of the Providence

---

[4] Desautels testified that when he removed Defendant from the police cruiser, he observed that Defendant was intoxicated based upon his watery bloodshot eyes and slurred speech.

[5] Defendant does not dispute that the following search of his residence was within the proper scope of the search warrant.

Police Department conducted a recorded interview of Defendant. Government's Motion, Exhibit 4.[6] In the interview, Defendant told the police officers that he had been out at a bar with his cousins "Gino" and "Kim Smith" before he returned back to 53 Dartmouth Avenue on November 3, 2009. Defendant initially denied living at 53 Dartmouth Avenue, but then later admitted that he had lived there for four or five months with his girlfriend Tina Arnold. Id. at 14. Defendant also admitted that he had been growing marijuana for approximately two months and had purchased the three guns that were found in his apartment. Id. at 16.

**B.     Defendant's Case**

The Defendant presented six witnesses: (1) Eugene Smith ("Smith"); (2) Kim Brown ("Brown"); (3) Juan Robles ("Robles"); (4) Robert Papa ("Papa"); (5) Brian Clements ("Clements"); and (6) Defendant. The Court has reviewed their testimony and finds Defendant, Smith, Brown, and Clements' testimony to be highly incredible.[7]

**i.     Defendant's Testimony**

Defendant testified that early in the morning of November 3, 2009, he was arguing with Clements in the courtyard of 53 Dartmouth Avenue. According to Defendant, when a police cruiser drove up to where he was standing, Clements told the officer that Defendant had "pulled a firearm on him." Transcript, vol. I, 164:22-23. The officer patted Defendant down, handcuffed him, and put him in the back of the police cruiser. Id. at 164-165. Defendant testified that it was from the back seat of the police cruiser that he saw several police officers enter his building.

---

[6] Defendant admits that he waived his Fifth Amendment right to remain silent both verbally and in writing.

[7] Defendant also elicited testimony from Robles and Papa in an attempt to point out inconsistencies in Greene and Desautel's testimony. The Court need not summarize Robles and Papa's testimony, however, because it finds that neither witness's testimony presented such material inconsistencies.

Defendant claims that seconds after the police officers entered his building, he saw flashlights in his bedroom from the window facing the courtyard. Id. at 166:8-11.

Defendant's testimony of the sequence of events of November 3, 2009 was diametrically opposed to Greene and Desautel's testimony. Defendant disputes Greene's testimony that Greene pursued him up the stairs of his apartment building and that Greene tackled him in the open doorway of his apartment. Defendant also disputes that Desautels later removed him from the cruiser and took him over to Clements for an identification. Transcript, vol. II, 14:25, June 21, 2010.

The Court has reviewed Defendant's testimony and finds it to be incredible for a number of reasons. Defendant testified that he permanently lived at 53 Dartmouth Avenue, but then stated that it was "off and on. It was [his] girlfriend's apartment." Transcript, vol I, 159:23-25. Defendant also admitted to making false statements to the police before he was arrested. For example, on the night of his arrest, Defendant told the police that he was at a bar with "Kim" and "Gino," but then later testified that that was not true. Defendant also told the police that "April" had given him a ride home that evening, but then testified that he had driven himself home.

Defendant's inconsistent testimony and admissions of untruthfulness are not the only reasons the Court has to treat Defendant's testimony as suspect. Defendant admitted that he had been drinking alcohol for several hours before his arrest and that he had been smoking marijuana. Id. at 4:7-19. Taking all of these factors into account, the Court concludes that Defendant's testimony is not credible.

    ii.    **Eugene Smith's Testimony**

Eugene Smith testified that on November 3, 2009, he lived at 53 Dartmouth Avenue in

apartment 5 on the third floor. Smith testified that he was in his apartment when he saw the police officers handcuff Defendant outside the building and put Defendant in a police cruiser. Smith further testified that he saw "other police officers [go] into [Defendant's] apartment and just start ransacking his place." Transcript, vol I, 93:6-7.

On cross-examination, however, Smith acknowledged that he is a twice-convicted felon and that he is still "kind of upset" with the Providence police because of how they have treated him. Transcript, vol. I, 106:2. Smith's testimony was also inconsistent. For example, at first Smith testified that he knew Defendant "because he lived in the same complex as [him]." Id. at 99:2. Smith later testified, however, that he "didn't even know [the Defendant] lived [in the building]." Id. at 100:3.

The Court finds it more likely that Smith saw Defendant being placed into the police cruiser when he was already handcuffed, after Defendant was placed under arrest inside the apartment building. The Court, therefore, does not rely on Smith's testimony to the extent that it is inconsistent with Greene and Desautels' testimony.

iii.    **Kim Brown's Testimony**

Brown testified that on November 3, 2009, she resided in Apartment 4 at 54 Dartmouth Avenue. According to Brown, she was looking out her window when she saw Defendant "getting arrested, getting [placed in] handcuffs." Transcript, vol I, 112:16. Brown testified that after she saw Defendant in handcuffs being placed in a police vehicle, she saw police officers go upstairs and enter Defendant's apartment. Id. at 113:13-14.

The Court does not credit Brown's testimony that she saw the Defendant "getting arrested." While Brown testified that she observed Defendant being placed into a police vehicle,

that does not directly contradict Greene's testimony that Defendant was arrested inside the apartment building and then brought outside in handcuffs and placed into a police vehicle.

### iv. Brian Clements' Testimony

Clements testified that on November 3, 2009, he was visiting his friend "Frank" who lived on Dartmouth Avenue. According to Clements, he was the one who called 911 that evening. When the police arrived at the scene, Clements told the police officer that Defendant had "pointed a gun at [him] through the back door and was going to shoot [him]." Transcript, vol I, 152:4-5. Clements further testified that he had tried to "slam" Defendant against the door so that Defendant would drop the gun, and Defendant ran back into the house. Id. 153:3-5. Clements then stated that when the police arrived, he saw Defendant run down the stairs and saw the police arrest him "right in front of the building." Id. at 154:3.

On cross-examination, however, Clements admitted that he had consumed alcohol that evening and that all he had "seen was when [the police officer] put [Defendant] in the police car." Id. at 158:21-23. Perhaps most telling was Clements' statement that the police put Defendant in the police cruiser "like they normally do." Id. at 154:10. This statement raises serious doubt as to whether Clements remembered the specific events of November 3, 2010, or was supplementing his imprecise memory by describing other arrests that he had previously observed. Taking into account all of these factors, the Court finds Clement's testimony incredible.

In sum, the Court finds that Defendant was arrested in the doorway of his apartment at 53 Dartmouth Avenue and was only brought outside and placed in a police cruiser after he was in custody. Moreover, the Court credits Greene's testimony that once Greene handcuffed

Defendant, Greene observed a firearm and bag of marijuana in plain sight.

## II. **DISCUSSION**

Essentially, Defendant lodges four discrete arguments in his Motion to Suppress. Defendant argues that (1) his warrantless arrest lacked probable cause; (2) the police lacked reasonable suspicion to conduct a valid Terry frisk; (3) the police lacked probable cause to lawfully conduct the warrantless search of Defendant's residence; and (4) Defendant's statement and the evidence seized from Defendant's residence were the fruit of an unconstitutional arrest and search.

### A. Probable Cause for Defendants' Arrest

Defendant argues that the police arrested him without probable cause. Probable cause exists when "police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe [that a] suspect committed or was committing a crime." United States v. McFarlane, 491 F.3d 53, 56 (1st Cir. 2007) (quoting United States v. Burhoe, 409 F.3d 5, 10 (1st Cir. 2005)). This inquiry focuses on "what the officer knew at the time of the arrest, and should evaluate the totality of the circumstances." Id. (citing United States v. Jones, 432 F.3d 34, 41 (1st Cir. 2005)).

When Greene pursued Defendant up the stairwell of 53 Dartmouth Avenue, Greene had already observed Clements pointing directly at Defendant and yelling "That's the mother F***er right there." Transcript vol. I, 13:20. Greene had also observed that Clements was visibly upset, and that Clements had fresh abrasions on his neck and chin that were not present when Greene had dropped him off earlier that evening. Id. at 12:9-14. Furthermore, Greene witnessed Defendant run up the stairs as he pursued him, and observed Defendant's right hand around his

waist, leading Greene to believe that Defendant was armed. Id. at 14:6-7.

Based upon the totality of circumstances, the Court finds that Greene had information upon which a reasonably prudent police officer would believe that Defendant had assaulted Clements. See McFarlane, 491 F.3d at 56. The Court therefore finds that there was probable cause to arrest Defendant.

## B. Pursuit into Defendant's residence for Arrest

A warrantless "forcible entry of a private residence is permissible in certain limited circumstances" including "hot pursuit of a fleeing felon." Hegarty v. Somerset County, 53 F.3d 1367, 1374 (1st Cir. 1995) (quoting Minnesota v. Olson, 495 U.S. 91, 100 (1990)). The police may make such forcible entry without a warrant only where there are exigent circumstances that present a "compelling necessity for immediate action that would not brook the delay of obtaining a warrant." Id. If, for example, the "criminal offense was not sufficiently serious ([like] a traffic violation)," such exigent circumstances would not exist. Id.

Here, Greene was in hot pursuit of Defendant, who he had probable cause to believe had committed a violent crime. Accordingly, the Court finds that the pursuit into the entryway of Defendant's residence was lawful.[8]

## C. Reasonable Suspicion for Terry Stop

The Government contends that even if the police lacked probable cause to arrest Defendant, Greene had reasonable suspicion to conduct an investigatory stop under Terry. Under Terry, the baseline rule is that an officer may "conduct a brief investigatory stop if he or she has a

---

[8] Defendant cannot argue that Greene's initial entry into the common entryway of the apartment complex was improper, because a defendant lacks a reasonable expectation of privacy in the common areas of an apartment building. See U.S. v. Rheult, 561 F.3d 55, 59 (1st Cir. 2009).

10

reasonable, articulable suspicion that criminal activity is afoot." United States v. Aitoro, 446 F.3d 246, 252 (1st Cir. 2006)(citing Terry v. Ohio, 392 U.S. 1, 30 (1968)). Although the standard is lower than that required to show probable cause, the officer must "possess (and be able to articulate) more than a hunch, an intuition, or a desultory inkling of possible criminal activity." United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004)(citing Terry, 392 U.S. at 27).

The validity of the investigatory stop is governed by a two-prong test based upon the totality of circumstances: (1) "whether the officer's actions were justified at the inception," and if so, (2) whether the officer's subsequent actions were "fairly responsive" to the circumstances justifying the stop in the first place. United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001)).

a.     **"Reasonable Suspicion"**

A stop is justified at the inception if the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." United States v. Kimball, 25 F.3d 1, 6 (1st Cir. 1994) (citing Terry, 392 U.S. at 21). Here, Greene observed that (1) Clements had noticeable abrasions on his face that were not present when Greene had dropped him off ten minutes earlier; (2) Clement's identified Defendant as his attacker; and (3) Defendant was running up the stairs while clutching his waistband, leading Greene to believe that Defendant was armed. Greene therefore had reasonable suspicion that Defendant had just committed a violent crime.

b.     **"Subsequent Actions"**

The Court's analysis cannot end with the conclusion that the police had reasonable suspicion to believe Defendant was committing a crime. The next step is to inquire as to whether the officer's subsequent actions were "reasonably responsive to the circumstances justifying the

11

stop in the first place..." Taylor, 162 F.3d at 18. The Court must look to the facts and circumstances to determine whether the force used by an officer was necessary based upon the severity of the crime suspected and whether the suspect posed a direct and immediate threat to the safety of the officer and the public. Graham v. Connor, 490 U.S. 386, 396 (1989).

Here, Greene tackled Defendant and handcuffed him. This force was reasonable based upon Greene's belief that Defendant was armed and dangerous. The very offense that Greene suspected Defendant had committed involved an assault with a handgun. Even if the Court concluded that Greene lacked probable cause to arrest Defendant, the Court would nonetheless find that Green conducted a valid Terry investigatory stop and frisk of Defendant.

**D. Search of Dwelling Subsequent to Defendant's Arrest**

Defendant argues that the initial search of his residence was unlawful, because it went beyond the scope of a permissible search incident to arrest. When a police officer enters a home without a warrant or the owner's consent, he or she must justify a "protective sweep" by showing that the officer had a "reasonable belief based on specific and articulable facts which, taken together with rational inferences from those facts, reasonably warranted the officer in believing that the area to be swept harbored an individual posing a danger to those on the arrest scene." Maryland v. Buie, 494 U.S. 325, 327 (1990)(internal citation omitted). This sweep must be limited, however, to a "cursory inspection of those spaces where a person may be found." Id.

During Desautel's initial search of Defendant's residence, he briefly searched each room and closet. He saw a gun in plain sight, and also found a small marijuana growing operation in a large closet, all areas where a person could have been hiding. Deusautels did not seize any of the items, and instead secured the apartment and waited until a search warrant was obtained. Based upon the fact that the police had reasonable suspicion that Defendant had committed a violent

12

crime, and the fact that Greene had arrested Defendant in the entryway of the apartment, the Court finds that it was reasonable for Desautels to conduct the limited protective sweep of Defendant's residence.

### E. Defendant's Tainted Evidence Argument

Finally, Defendant argues that his statement and the evidence seized from the search of his apartment should be suppressed because they are the "fruits" of his illegal arrest and the unlawful search of his residence. The Court has concluded that the police had probable cause to arrest Defendant, and that they conducted a valid protective sweep of his residence incident to that arrest. Desautels obtained a valid search warrant based upon Greene's affidavit, Clements' statement, and the gun and bag of marijuana observed by Greene in plain sight. Accordingly, Defendant's Motion with regard to the evidence seized from his residence and his statement is likewise DENIED.

### III. CONCLUSION

For the aforementioned reasons, Defendant's Motion to Suppress is DENIED.

SO ORDERED.

_Mary M. Lisi_
Mary M. Lisi
Chief United States District Judge
September 7, 2010